The Honorable the Judges of the United States Court of Appeals for the 4th Circuit. You can be seated. Our second case is 21-14-16, U.S. Methanol v. CDI Corporation. Mr. Webb, whenever you're ready. Mr. Webb. Yes, Your Honor. Good to have some West Virginia lawyers here today, Mr. Webb. Thank you. May it please the Court, my name is Ken Webb. I practice at Bowles Rice in Charleston, West Virginia. I represent U.S. Methanol in the appeal that's before the Court. U.S. Methanol appeals two separate orders of the District Court. The first was an October 21, 2019 order that dismissed U.S. Methanol's tort-based claims under Rule 12b-6 and also under the Action Doctrine and Borrowed Servant Doctrine. The second order was an order that was entered June 5, 2020 that dismissed or granted summary judgment in CDI's favor on the remaining count in U.S. Methanol's complaint, which was based upon a breach of contract claim. We believe the District Court erred in granting summary judgment on the breach of contract claim because it construed the language in an engineering staffing agreement to completely insulate CDI from liability for one of its employees, one of its augmented staff members' negligence with respect to the foundation design for a methanol plant. We also think the District Court erred by dismissing the tort-based claims by misapplying the gist of the Action Doctrine and by ruling on the Borrowed Servant Doctrine before there was any substantive discovery on the facts that would give rise to the application of the doctrine. We think the standard of review in both instances is de novo. Mr. Weber, do you agree with me, it appears to me, that the contract that you allege was violated was written only after U.S. Methanol had already decided that they wanted Mr. Chase in particular. Is that, as a factual matter, true? That is correct. That contract was a follow-on after the recruitment process, searching for the candidate, discussions with the candidate, and then confirming that Mr. Chase was going to be placed at the U.S. Methanol project. That's when the staffing service agreement was sent. And you don't allege there was a violation of the recruitment contract? To the extent there was a contractual relationship before that, you don't allege a violation of that contract? We allege that the contractual relationship is the relationship that's set out in the staffing services agreement, which is the November 10th letter. Okay, so given that, I guess I'm having trouble figuring out when the parties say, I will supply you with Mr. Chase. I mean, I certainly think that they would violate the contract if, having promised to supply you with Mr. Chase, they supplied you with someone who was not Mr. Chase. That would clearly be a violation of a contract to supply Mr. Chase. But in a circumstance where you'd already agreed it was going to be Mr. Chase, why should we interpret this contract as imposing some additional requirement, not just to supply Mr. Chase, but to ensure that Mr. Chase, who you participated in selecting, wouldn't do a bad job? CDI was an engineering company located in Kanawha Valley. They're an international company. They've got offices in different places. Because in our Kanawha Valley, along the river, we have a lot of chemical, heavy chemical industry. They located an office there. One of the things they specifically offered was staff augmentation services. And so we went to them, U.S. Methanol went to CDI, because we didn't have an engineer on staff. We were a startup company relocating. No, and I agree with that. So if the contract had said, look, you're the experts, we're not the experts. Supply us somebody who meets our needs. And they picked someone. And that person did a lousy job because they were unqualified. I could see an argument that that's a breach of contract. I guess here's a counterfactual. Once the contract says they had to supply Mr. Chase, what if they woke up one morning and said, you know, I'm just worried that Mr. Chase is not up to this job. I think he's going to do a poor job on this retaining wall. But I've got some good news. I'll give you Mr. Heightens instead. You would have said that's a breach of contract. The contract required them to supply Mr. Chase. So it's a little strange to me to say they shouldn't have sent Mr. Chase because Mr. Chase wasn't going to do a good job when they had negotiated for a contract that required them to supply Mr. Chase. And you could have accused them of violating had they tried to sub in Mr. Heightens instead. The contract required that they provide us somebody who met our needs. Somebody who was qualified. No, the contract required they supply you Mr. Chase, right? As we read, with all due respect, as we read the contract. I thought y'all already picked Chase, but then you had the contract. We interviewed him. They represented to us that he was qualified. But before you interviewed him, you got his resume. We did. They gave you his resume, which had exhibits to it and things? Yeah, it had some references. Yeah. And you interviewed him. Who interviewed him the first time? The first time it was our in-house guy, Jeff Beverly. Mr. Beverly, who was the licensed engineer. Yes. And then he was interviewed and a week or so later, you brought him back for a second interview. And who interviewed him the second time? I don't recall their names, Your Honor, but they were higher ups in the U.S. Methanol Corporation. Yes. They were the bigwigs. Yes. They interviewed him a second time and you picked him. Yes. And then you wrote up his contract. CDI prepared the contract after we settled upon Mr. Chase. It was approved. Yes. And it had a clause in there that Judge Goodman liked, about 40 hours. If you didn't complain within 40 hours, it was deemed or was presumed to be, he was deemed or was presumed to be satisfactory. Yes, his satisfactory, his service over those first 40 hours was satisfactory and we had to pay the invoice when they sent it to us, which we did. The other clause that Judge Goodman liked was the clause in the staff servicing agreement that said, you're obligated, you agreed to provide us with somebody who was qualified to meet our needs. Yes, we interviewed him. CDI participated in those interviews. CDI found Mr. Chase as the candidate and told us, he's a great fit. He'll do good in your project. When we interviewed him, we said, look, we need deep concrete foundations to support this methanol plant. We've had a geotech study say that. Do you have experience doing the deep concrete foundations? And Mr. Chase said that he did. That was Mr. Chase. That wasn't CDI. Mr. Chase was the person that CDI found for us under their staff augmentation role. What specifically do you say in this November 10, 2016 contract? What do you specifically identify in here as a part of the contract that CDI breached? It's the same thing that the circuit court found. The language in the contract where CDI committed to finding us somebody who met our needs, exceeded our needs and expectations. And it's the same analysis. Is that the clause that they argue was aspirational? They did argue at one point that was aspirational. But Judge Goodman never did address that issue, aspirational. That's correct. As I recall. That's correct. They're still claiming that's what it is. And the aspirational. That's an alternative way for us to affirm this thing. They haven't given up on that. I agree. They haven't given up on it. If that part of the contract, if the contract's completely aspirational, it's nugatory, doesn't have any effect. No, but it's not. Again, let me see. I think I know your answer to this, but let's confirm. If they had sent instead of Mr. Chase, if on the day the work was to begin I had showed up and said, hi, I'm Mr. Heightens, CDI sent me here, you would accuse them of breaching the contract, right? Because the contract says supply Mr. Chase. The contract, I agree the contract was specifically referencing Mr. Chase, but more importantly. I think I'm almost there, but do you agree that if they had sent someone who was not in fact Mr. Chase, that would have been a breach of contract? Not necessarily. The contract says they have to supply Randall Chase, and then someone who's not Randall Chase shows up? If Mr. Chase doesn't meet the need, the contract contemplates expressly that CDI can send somebody else who meets the need. And so if CDI had decided between the interview and the placement, well, maybe Mr. Chase doesn't meet the need. They could have sent us somebody else. What is your best? I will confess, I mean, I feel like I've signed agreements like this with a variety of service providers in my life. So the precise language is we are committed to providing you with personnel whose abilities meet or exceed your. I feel like my agreement with Verizon probably says that. What is your best authority for the proposition that language like that creates a definite and certain obligation sufficient to support a breach of contract claim? That was a finding. That was a finding of the district court. And so in responding to the initial motion to dismiss the. . . I don't agree with that. I mean, if it looks like that this is some sort of puffery. . . If it's. . . The contract's not invalid, as Judge Huytens has indicated. CDI agreed to provide Mr. Chase. They did. There's a clause that says, has the 40-hour part. He worked the 40 hours, and you didn't reject him. So the contract's not void on its face. I guess we could ask the West Virginia Supreme Court whether this sort of aspirational or puffery language is valid in West Virginia and what it means, but I don't know what the West Virginia law is on that, and I'm not sure there are cases that tell us. Yeah, and we didn't brief that below. That didn't get any traction with the district court. I will say that if this is illusory and the contract doesn't contain. . . The 40-hour thing. He, in fact, worked for a year. Yes. He got the resume. You interviewed him, and you knew from the resume he was not a licensed engineer in West Virginia. Correct? Correct. And he worked under the supervision of Mr. Beverly, who was a licensed engineer in West Virginia. Correct? That's correct. And everything he did as an engineer for methanol, he did under the supervision of Mr. Beverly and others. Correct? That's correct. And everything he did for methanol was signed off on and approved by Mr. Beverly as the licensed engineer of West Virginia. It was approved as deformed. And in spite of all that, you say you got a cause of action. And that almost flies in the face of I don't know what. . . Mr. Beverly does not have any expertise in deep foundation design. But he's the licensed engineer, and he approved, supervised and approved and signed off on everything this guy did for a year. And then you figured out, well, what he did was a mess, and you fired him. Mr. Beverly certainly made the assignment and said. . . And you fired him, and then you filed this lawsuit, and that's where we are. Yes. Mr. Beverly certainly said, what we need you to do is design these deep concrete foundations. If Mr. Beverly had. . . You not only sued CDI, you sued Chase. We did. If Mr. Beverly had the expertise to do the work, he'd have done the work. We went to CDI because we didn't have. . . But he signed the engineering. . . He approved. . . He supervised the engineering, and he signed off as the licensed engineer. He approved. . . Well, he's the one. . . You never said he committed any malpractice. He didn't do the design work. He approved the plans for construction. He said they looked like construction plans. I approve them for construction. He didn't approve the design. He didn't have the expertise. So why is that CDI's fault? Well, I mean, what in this agreement imposes some duty on them to have certified, in your view, Mr. Chase as having particular expertise in a subform of engineering practice? The record is replete with testimony about what CDI offered in terms of its staff augmentation services. We'll find somebody that meets your needs. The fact that Methanol and CDI had discussions about what those needs were, and only after that did the recruiters at CDI go out and find Mr. Chase. If this agreement is illusory, then the gist of the action doctrine doesn't apply. There aren't any obligations in the agreement that trump or preclude the tort claims. That was never reached by the district court. And so if it's illusory, can't sue in contract, we can sue in tort. The Borrowed Servant Doctrine is an alternative holding, and there's a lot of language in here that indicates that all the supervision of Mr. Chase, I think as Judge King and maybe Judge Heitens have indicated, all that was done by your client. The Borrowed Servant Doctrine, Your Honor, is a fact-intensive inquiry where somebody possesses expertise. You're not just constructing a fence or painting a house. But you're applying your expertise. The element of control is lacking. If I don't have the expertise to do the work, I can't control you. I'm dependent upon you to do the work. There's a long line of cases, and we really didn't get there because it was dismissed, but there's a long line of cases that says if you're a crane operator, you have expertise, and a crane operator can't be a borrowed servant. Mr. Chase was a structural engineer with supposed expertise in deep concrete foundation design. We didn't possess that expertise, and so there's a real question. What about this language from the contract? Technical direction of the work being performed by Randall Chase on assignment and the content of such work will be your responsibility. We gave the technical direction. We told Randall Chase, we need you to design the deep concrete foundations. That was the technical direction. We weren't in a position to say whether or not they were correct or accurate designs because we didn't have that expertise. That's why we went to CDI in the first instance. I see my time is about up. In conclusion, we think that the release issue, the 40-hour clause in the document, is not an adequate release under West Virginia law. We think the contract is not illusory to the extent the district court already found that it contained an actionable promise that they would provide us somebody who would meet our needs. That person didn't. We think that alternatively you can't, and the district court didn't discuss this at all, you can't engineer because they're a professional and have regulatory and statutory duties of care, can't disclaim responsibility for deviations from that duty of care. Finally, we think that the gist of the action doctrine shouldn't apply, particularly if the contract is illusory. But in this case, because there were statutory duties of care and not just duties that arose under the contract, gist of the action shouldn't apply, and borrowed servant doctrine was dismissed without an adequate factual record. For those reasons, we think there was error below and that the case should be reversed and remanded. Thank you. Thank you, sir. Mr. Robb? Yes, Your Honor, one second. May it please the Court, my name is Peter Robb. I'm with Steptoe & Johnson in Charleston, West Virginia, on behalf of CDI. This is not a complicated case. This is a straightforward breach of contract action. The district court looked at the contract. It's short, admittedly, but it's very straightforward. It outlines the party's responsibilities. It outlines what CDI was obligated to do, place Mr. Chase, process payroll, process unemployment, taxes, workers' comp, and the like, and it obligates methanol's responsibilities. U.S. methanol was to provide technical direction, was to provide projects, approve those projects, review those projects, all that. It's clear as day from the contract itself. Lengthy contracts aren't necessarily better. As Judge Heitens noted, we've all probably signed contracts like this without reading them, but these are two sophisticated business entities that entered into an agreement, and both sides admit that this is that agreement. Can I ask you about this? This document isn't executed by both sides, but I gather you've not preserved any sort of argument that you don't have a contract at all here, right? No, there has been no argument by either side that this is not, in fact, the contract. Obviously, this was brought as a breach of contract claim. Obviously, there are the tort actions that the court dismissed as part of the motion to dismiss, but when we attached the contract to our motion to dismiss and said, Your Honor, Judge Goodwin, here it is, here's the contract, we did get an objection saying you can't attach the contract, which is obviously not the law at all, but there's never been an argument by either side that this is not the governing document that we're here today to discuss, and I believe Mr. Webb actually said, and I can't read my handwriting, but no, we agree that this is the contract that we're here today about. But this is a straightforward contract that obligated the parties to do, in one case, CDI, to place Mr. Chase and provide certain administrative, I'll call them administrative general employer obligations, and in return, excuse me, Methadone agreed as to what it would do, and the parties also agreed, and I know that we have an argument as to puffery. This is aspirational language, and I'm happy to discuss that some more, but Judge Goodwin rightfully looked at this at the end of the day, and the district court said, Yes, there is language about your commitment to provide someone who meets needs and expectations, but it also says quite clearly in the agreement that there are certain things that are outside of CDI's control. There are certain things that we can't do. And then it went in to discuss the fact that technical direction would be at the behest of Methadone, that Methadone would supervise and approve all work, which, again, is in the contract, but the record very clearly shows that's actually what happened over the course of nearly the next year. And in looking at that, in looking at what we commit to try to do, but what also the parties, by entering this agreement, understood were limitations on CDI, there was language in there that said, and I think Mr. Webb implied that CDI could have just decided to send somebody over there to replace Mr. Chase, but the contract doesn't contemplate that. What it says is, if you, Methanol, are for some reason dissatisfied with Mr. Chase, notify us. Let us know. And we will endeavor, and I admit I'm not using the exact language here, but we will endeavor at that point to replace him. That obviously never happened. But the next sentence or so says, if you do this in the first 40 hours, that will be on us. But then, and this is the relevant language that the district court looked at to determine that the parties had agreed and obviously this had happened, if you keep Mr. Chase on staff at your site and under your supervision for more than 40 hours, you agree that his performance is satisfactory. And I think the district court rightfully looked at that and said, obviously he's been there for 10, 11 months, he didn't complain, you terminated him, which was the right under the contract, but you didn't ask that. You kept him for more than 40 hours. And if you are satisfied as of work, if you admit in a contractual document that you agree as the contract that his work is satisfactory. I ask you why my biggest concern about that, it's a variation on this case, but I don't think it's. . . So imagine everything in this case is the same except for the following. Mr. Chase flat out lied about whether he had an engineering license. He does not, in fact. . . I know this is not really true, but imagine Mr. Chase in reality has no engineering license whatsoever. Imagine that your client knows that fact. It is aware of the fact that he has no license whatsoever and imagine that his client does not know that fact. Is your view that in that situation, once he's on site for 40 hours, if they haven't objected, there can be no breach of contract, even though they hired him despite they believed he had an engineering license and you knew that he did not? As you frame that, Your Honor, there would be a cause of action and I will concede that. Okay, so why would there be there and why is there not? Why would there be there and why is there not here? Yeah, I understand. In that circumstance, and obviously that's a factual inquiry into the idea that there is, in the circumstance you presented, that's called, I'm going to get this probably wrong, fraudulent concealment perhaps, that we know what they're looking for exactly, that we know a material fact, in this case, that they're looking for someone who, for example, is a PE. We know he's not, but we still hold him out as if he is. But the record in this case doesn't show that that's what happened. The record in this case… That would be some sort of fraud in the inducement or unilateral mistake. I think it's fraudulent concealment perhaps, or it might be fraud in the inducement depending on how the communications went back and forth. But obviously the record here shows that's not what happened in this case. What happened in this case, and again, I think it was referred to as a staff engineering augmentation by Mr. Webb. The word engineering isn't in the title of this document. It's a staff augmentation services agreement. You had, Jeff Beverly, had previously, and this is in the record, had previously worked at CDI. He knew, I think he was there for 18 months to two years, as an engineer on the engineering side. But he knew that there were two sides. There was also a staff augmentation side of CDI's business. He knew the folks who worked in that. Stephanie Glandon is a name that you may recall from the briefing. And he… So that side was basically a headhunter. Exactly. I would, the equivalent of, and Mr. Beverly actually testified that he went to these groups to also search for an engineering potential candidate, manpower. I think the other one was Kelly, which are both nationally known, fairly large engineering, not engineering, staff augmentation, staff placement services. But he knew from his time at CDI that that service also existed. There were two options, and Mr. Beverly knew this, that they could have gone to CDI and asked to directly retain CDI. Essentially bring them in and CDI would run the show and figure out all the problems, do all the work themselves. Or, as he did in this case, and he also tried to do, I believe, with a competitor named Jacobs, is just go and see, can you find a candidate? I will give you the qualifications that I am looking for, and he did in a specific list, and can you see if you can find potential candidates that will then, if they give you resumes, you can forward them to me, which is what happened here, and then we at Methanol will interview those candidates, as they did here, have a tech talk with those candidates. Is there anything on this list that's argued by Methanol that you all failed to meet? I don't believe so. And I will say that you've heard the word at least once or twice, and it's repeated throughout the briefing from Methanol, that they needed someone to do, and the word is, I'll use quotes, auger cast pilings, and deep, in quotes, concrete foundations. There is actually no evidence, though, in the record, that wasn't in the list, that the words auger cast are nowhere in the list, and deep is nowhere in the list of qualifications sent by Methanol to CDI, and Mr. Beverly, who's obviously the engineering supervisor, testified that he had a call with folks at CDI, where he may have mentioned some of the needs, but he later mentions he didn't even really understand, apparently, what the difference was between auger cast and regular piling, didn't relay that to CDI, but there's no indication in the record, and certainly not in the description of qualifications necessary that was sent over, that they were looking for someone who needed to be able to do auger cast pilings and deep concrete foundations. The list was essentially copied, I mean, not essentially, it was copied verbatim, and sent out. As is in the briefing, Mr. Chase's resume itself indicates that he had experience with pilings and concrete foundations. It was on several places in his resume, the same resume that was ultimately provided to Methanol, that Methanol reviewed and said, we have some concerns over his plant experience, but nevertheless, we would like to interview him. They did that. They had a detailed technical talk in which they went over Mr. Chase's experience, qualifications, background. Again, as noted, they realized that he was not a professional engineer. Why wasn't he a professional engineer? They didn't ask for one. Oh, why wasn't he? What happened to Chase? He's got an engineering degree, they list him as master's work, 34 years of experience, everybody's satisfied, list of satisfied clients, more than 500 companies, and they say, but he's not a licensed engineer, a professional engineer. How, was he delicensed or disbarred? There's no evidence in the record of either of those. To answer your question, I don't know. You don't know. I don't know. Nothing in the record. No, there's nothing in the record that says that. No, I don't know. There's nothing in the record that says that he was punished in some way. But he was a defendant here. Was he deposed or anything? Did anybody ask a question? He was deposed. I don't believe, if it was discussed, I don't believe that portion is anywhere in the record, but I don't believe that question was asked as to, other than perhaps, so you're not a PE, no. I will say that, for example, and I think this is in the record, Mr. Beverly testified that at the time that this case was actually in litigation, that he had stopped with his, I don't know if that's the correct term, stopped being a professional engineer. He had, I don't know if it's de-licensed himself, he just decided he didn't want to be a professional engineer anymore either. This is, of course, after the fact that he had approved, which I will say, and it's in our briefing, approved all of these plans, and if he was incapable or unable to do so, that is in violation of West Virginia's engineering statutes because that is quite clearly and obviously the practice of engineering to review and approve blueprint after blueprint after blueprint that would then go to construction. So Mr. Beverly, who was a PE at the time, was violating West Virginia law quite clearly. Let me ask you about this 40-hour provision in the agreement. Methanol says that this is ambiguous, that it could be reasonably interpreted as a condition precedent to the obligation to pay for Mr. Chase for his first 40 hours, and that because the provision is capable of multiple readings, that you could not either find as a matter of law or undisputed fact in summary judgment that it was a contractual limitation on liability. So if we agreed with them that it's ambiguous, what happens at that point? That's an excellent question. If it is ambiguous— Well, we hope you have an excellent answer. Your Honor, I would like to say that I always have excellent answers to questions. That, my wife would insist, is not completely accurate. If it's ambiguous, then there has to be some sort of factual determination as to what exactly the parties intended by that and what it meant. I would proffer to you, though, that, as Judge Goodwin at the district court level concluded, that that language is not at all ambiguous. It clearly says— I thought you would say that because we are going to provide you with personnel whose abilities meet or exceed your expectations, that since that's aspirational, there is no contractual obligation in that sense. One of our arguments is that the language itself we are committed to. We're going to do a — we're going to try to do a great job, is aspirational. We've cited to a number of cases that discuss that. I don't believe that methadone response is cited to any cases to the contrary. But we've said, look, we believe that's aspirational. But nevertheless, assuming that it is aspirational, and the district court did not do so, it looked at the clear language of the contract and said this sentence about if you keep a person on assignment for more than 40 hours, it is agreed, and obviously this court has the language right in front of it, agreed that his performance is satisfactory, and— But hypothetically, if that were deemed the aspirational puffery language that was not binding, then what difference would it make about the 40 hours? I don't think it makes a bit of difference, because at the end of the day, if it's — if the language is aspirational, there's still a contract. We still agreed to place Mr. Chase with methanol. And in exchange for the various services that were provided under the contract, including processing his pay, unemployment benefits, workers' comp, et cetera, we, CDI, receive money. That's a give and take. That's called consideration. That's still a contract. Just because one portion of a contract may not hold up doesn't mean that the contract gets thrown out. In this case, even if you conclude that we are committed to is an aspirational term, there's still very much as a contract in which both parties agreed in exchange for mutual consideration to engage in certain responsibilities. So even if you take that language out, there's still a contract. The judge, Judge Goodwin, decided I don't need to go there because I've got a clear limitation that regardless of whether this language is aspirational or not, and all these illusory arguments, et cetera, were made in the motion for summary judgment phase, there's still a very clear limitation that the parties, these two sophisticated entities, agreed that we will limit any claims that we may bring with respect to this contract based on this language here. Let me ask you something about the negligence claim. So your colleague on the other side says that the borrowed servant doctrine is a quintessentially fact-intensive inquiry that you really can't resolve in a motion to dismiss. Could you respond to that? It can be if the contract isn't clear as to who's doing what. But in this case – But the borrowed servant doctrine is a defense. It's not part of the plaintiff's affirmative burden, right? Correct. So how could I resolve that on a 12b-6? Because on a 12b-6 motion where, for example, there are breach of contract claims, we were well within our rights, and district court understood this, to attach the contract to say – and the reason we did this initially was, frankly, that there were claims that we had contractually agreed to design the whole plant, which was obviously not in there. We attached the contract. And while the borrowed servant doctrine can be a fact-intensive inquiry, this contract – and I think Judge Heitens, in your earlier questioning, pointed out that it clearly states what Methanol's obligations were and what their rights were. They had the obligation and right to complete control over project assignment, supervision, and approval, and the technical direction. All of that language is very clearly in the contract. It's not ambiguous in terms of who was responsible for what. I want to make sure I have this right. So your view is that because this case is fundamentally about the contract, the contract can be attached, even if it's not attached to the complaint, because it's those cases that basically say if the complaint is about a document, the document itself is necessarily part of the complaint. And then your next argument is the contract itself makes clear that as a matter of law, the borrowed servant defense applies? Correct. Would apply if we get there. Correct. And I think, you know, there may be contracts where the language about technical direction and approval may not be in there. And in that case – or, frankly, the party may not even raise it, which I think was one of the cases they mentioned. It wasn't even raised at the motion to dismiss stage, but it was only later raised at a summary judgment stage. But if the contract itself fairly clearly delineates the party's obligations, responsibilities, and in doing so states that, for example, in this case, that all technical direction and approval and assignment will come from Methanol, that he will work under your supervision. And in this case, it actually said you have the right to let him go. There's been some argument to the contrary, but it fairly clearly says that CDI doesn't have to concede consent to that. And that you will indirectly pay him by billing us, and then we will actually cut his check. The case law on that in West Virginia and elsewhere is that that meets, just by looking at the contract itself, the clear, unambiguous language of the contract itself, that meets the requirements for the borrowed servant doctrine. And the Court looked at that and said, look, even if the gist of the action doctrine doesn't apply, and we believe it does, because the doctrine lists, and I'm running a little short, but there are four different circumstances in which the gist of the action doctrine can apply, and only one of them has to apply in that case for it to apply. It clearly does here. But even if that were not the case, the district court was able to look at this contract, the language in the contract that the party specifically agreed to, and determine that Methanol had agreed that it would, for all intents and purposes, be solely responsible for supervising the work of Mr. Chase, for directing the work of Mr. Chase, approving the work of Mr. Chase. And, again, you know, at the end of the day, I struggle to find where we'd be on remand on that issue, based on the record, because Mr. Beverly fully admitted that I tasked Mr. Chase with all of his assignments. I approved them, as the professional engineer, and in compliance with West Coast law. Mr. Chase didn't have an office at CDI. He didn't communicate with anybody at CDI about his work. His email was from Methanol. His only office was in Methanol. He didn't communicate with anybody at CDI. And, in fact, CDI didn't know that he had been told to pack his bags and leave until after he was gone. So the court, you know, obviously was able to look at the contract's language and determine it's all in here. There's no factual inquiry that needs to be taken for me to reach this conclusion. But at the end of the day, if we're remanded on that issue, where would we be? Because Mr. Beverly admitted that all of those things that we said we were going to do in the contract, we at Methanol did. The contract was followed. And that's the end of the inquiry there, and all those negligence claims go away. I believe I'm out of time. I have more questions. I think I would just say the district court got this one right. It's not complicated. Thank you very much, sir. We appreciate it. Mr. Webb? Briefly. You've got some rebuttal time, sir. The borrowed servant doctrine is fact-intensive. One of the things that you have to analyze is the degree of control, the degree of expertise or specialty of the servant. Those things matter. Those things are factual issues that make a difference on whether or not you apply the doctrine. Mr. Webb, let me ask you this then. So maybe assume for the sake of argument, I think the district court jumped the question. I'm not saying I think that, but imagine I thought that. But then this case proceeded at the summary judgment, and there was evidence and testimony. Could you tell me what in the summary judgment record is your best evidence that they maintained any control over him whatsoever after he was assigned to work for you? The best evidence is we went to CDI to find somebody with the expertise. No, no, no. I'm not asking about retaining him. I'm saying once he went to work for you, what is the best evidence in the record that you consulted them about anything about what he did? Did not. Did not. Went to them and said initially, we can't design these deep concrete foundations. We don't have the expertise. We need somebody with that specialized expertise. Ended up with Mr. Chase. Mr. Beverly said, go design. You're the guy with the expertise. You're the guy that was sent to us. We don't really have an ability to control his design because we can't do it. I guess what you're arguing is that you lack the capacity to do it. I mean, it doesn't appear to be disputed that he, in fact, showed designs to Mr. Beverly and Mr. Beverly said they look okay, right? And approved them for construction. He didn't seal them with a West Virginia engineer stamp. He signed them and said approve, check the box, approve for construction. And so the point I'm trying to make with respect to the borrowed servant doctrine is just like in the crane cases. I might be an owner and I'm putting a bridge in. And I might say crane, put the steel in place for the bridge. That's still specialized. And the courts have said I don't have the ability to control that person because of their specialized knowledge. I can make the assignment. I can direct their work. Put the steel in. I need a bridge. But under the borrowed servant doctrine, they're not my borrowed servant because of their expertise. That's the argument I'm trying to make. That's the part of the record we didn't develop because it was thrown out at the dismissal stage. You only touched on it briefly, but you have a separate count in negligence for breach of the practice of engineering statute. So if all the facts were the same, but instead of going to CDI, methanol went to Kelly Personnel or Manpower or Joe's Headhunters. And the same events occurred, would you be arguing that Kelly Personnel was in the practice of engineering and they violated it? If they sent us an engineer, yes. If they vouched for that engineer and sent them to us as being somebody. Why is the headhunter function the practice of engineering? With respect to CDI, it clearly is. CDI is an engineering company that has a consulting engineering side and a staff augmentation. You didn't retain the consulting engineering side. You retained the headhunter side. So why are they different from Kelly? It's a little more than headhunting when you keep him on your payroll. Well, Kelly does the same thing. He's your employee. That's my impression of the same thing is true of Manpower. When people are sent out by Manpower. That's one of their niches in the market, is that they provide all these payroll services. It's, I believe, when those factors also go to borrowed servant doctrine. But when you retain them on your payroll, when you have a say in their hiring or firing, and I think CDI reserved that right to have a say, I think that elevates it more than just a temporary service, particularly where there's an expertise involved like an engineering function that was involved in this case. With respect to the 40-hour clause, the 40-hour clause says what it says. And it doesn't say what it doesn't say. It doesn't say if we keep this guy on for 40 hours, you've got to pay him. And, oh, by the way, if he screws your foundation up and your methanol plant's delayed and it costs you $5 million to correct, you're releasing us from liability for that, too. And there's some pretty good West Virginia authority on point that says if you want to enforce a release clause like that, it needs to say that. And you need to clearly show that the plaintiff agreed to that so that you have a meeting of the minds. That's not at all what the facts are in this case. Preliminarily, you have to wrestle with the illusory argument. If there's no contract, the complexion of the case changes just that the action doesn't apply. You fall into the tort claims, including the negligent recommendation placement claim. Get back into the tort claims, you get back into the professional negligence and negligence claims. The other thing you have to wrestle with, that the district court did, and if I could just have a little bit more time to conclude, Your Honors, is the whole notion of the statutory duty of care imposed upon engineers and engineering companies. We definitely think this was the practice of engineering, the statute would apply, and because the statute applies, it's not just to the action anymore. You have a statutory duty of care, not just a contractually created duty of care that would give rise to the negligence claims. Thank you, Your Honors. Thank you very much, Mr. Webb, and thank both of you for your fine arguments and for your work in this case. It's good to have you here, and if we could do so under the restrictions imposed by the pandemic, we'd come down and shake hands with you. Thank you for traveling here and arguing the case, but we're not doing that right now. And Madam Clerk, we'll call the next case.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens